IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

HARRIS FOGEL,                               :
1006 Edgewood Drive                         :
Springfield, PA 19064                       :
                                            :
            Plaintiff,                      :
      v.                                    :   CIVIL ACTION NO. 18-cv-05137
                                            :   JURY TRIAL DEMANDED
THE UNIVERSITY OF THE                       :
ARTS,                                       :
320 South Broad Street                      :
Philadelphia, PA 19102,                     :
                                            :
ANNE  MASSONI                               :
1615 East Moyamensing Avenue,               :
Philadelphia, PA 19148                      :
                                            :
JENNIFER LITTLE,                            :
1027 Warfield Ave. Apt. 2                   :
Oakland, CA 94610                           :
                                            :
            Defendants.

AMENDED COMPLAINT

Professor Harris Fogel ("Plaintiff" or "Fogel") through his undersigned counsel, files this

Amended Complaint against defendants The University of the Arts ("UArts"), its employee,

Anne Massoni ("Massoni'), and Jennifer Little (Little'), an Associate Professor of Art and

Graphic Design at the University of the Pacific and, in support thereof, avers as follows:

I.   NATURE OF THE ACTION

1.      Professor Harris Fogel, a former Professor of Photography at UArts seeks

damages from UArts as it is responsible for the actions of a small group of administrators who

discriminated against him on the basis of his gender when they purported to give credence to a

completely false, unsupported, undocumented and implausible allegation of sexual harassment

from defendant Jennifer Little and another non-student, and then used those allegations to justify

their termination of him. In doing so, UArts, violated its legal duty under Title IX of the Education Act Amendments of 1972 (Title IX) by discriminating against plaintiff on the basis of his gender and breached its contractual and other legal obligations to him.

2.     Professor Fogel also seeks damages from defendants Massoni and Little for defaming him.

## II.     THE PARTIES

3.     Plaintiff is a resident of Pennsylvania residing at 1006 Edgewood Drive Springfield, PA 19064.

4.     Defendant Massoni is a resident of Pennsylvania residing at 1615 East Moyamensing Avenue, Philadelphia, PA 19148.

5.     Defendant UArts is a private institution of higher learning with a principal address of 320 South Broad Street Philadelphia, PA 19102. It describes itself as the only institution of its kind in the nation, offering programs in design, fine arts, media arts, crafts, music, dance, theater and writing. UArts receives federal funding and is subject to the mandates of Title XI. In its student and faculty handbook, UArts specifically refers to Title IX and its mandates and identifies the roles at UArts played by the Title IX Coordinator and deputy Title IX coordinators.

## III.     JURISDICTION AND VENUE

6.     Plaintiff invokes this Court's original jurisdiction under Title IX of the Education Act Amendments of 1972, 20 U.S.C. §1681, *et seq*.

7.     Pursuant to 28 U.S.C. §1391, venue for this action properly lies in this district because a substantial part of the events or omissions giving rise to the claims set forth below occurred in this judicial district.

8.      Plaintiff also invokes this Court's jurisdiction over related state common law and statutory claims under the principles of ancillary and/or pendent jurisdiction pursuant to 28 U.S.C.§1367.

9.      Plaintiff also invokes this Court's jurisdiction pursuant to 28 U.S.C.§1332, diversity of citizenship, as to defendant Little as she is a citizen of the State of California and plaintiff is a citizen of the Commonwealth of Pennsylvania and the amount in controversy exceeds $75,000.00, exclusive of interests and costs

## IV.  STATEMENT OF FACTS

10.      Prior to the events that give rise to this lawsuit, Little and Professor Fogel were professors of photography at different universities and had been professionally acquainted for several years.  Professor Fogel had invited Little to exhibit at UArts in 2015, which she did, and Little often sought Fogel's advice on professional and personal topics. She asked him to be a reference for a job search she was about to start as she wasn't happy at her university, and was looking for a new position, despite having been granted tenure. Professor Fogel regarded Little as a friend and colleague, but he had no romantic interest in her whatsoever and is happily married to his wife, Nancy, and the father of grown children.

11.      Despite what appeared to Professor Fogel to be a collegial professional relationship, including a request from Little to collaborate, Little, however, initiated the process by which Professor Fogel was terminated when, on December 10, 2017, she wrote to the UArts Title IX Coordinator and Diversity Director Lexi Morrison and asserted that on some unspecified day in March 2016 Professor Fogel had greeted her with a kiss upon his seeing her at the Society for Photographic Education ("SPE") Conference in Las Vegas, NV. According to Little, the kiss

was unwelcome and took place in the daytime in the lobby of the hotel where the conference was being held.

12.     Notably, Little did not complain or say anything to Professor Fogel about his greeting her in that manner, and she and Professor Fogel thereafter attended various functions together in public at the SPE Conference. Little posted Professor Fogel's photographs of the conference that included her to her Facebook account. On in formation and belief, prior to Little's submission of her complaint, Massoni informed her that there were "other complaints about Fogel" and Massoni told Little this to encourage her to file a complaint about Professor Fogel, which she then did.

13.     After receiving the report from Little, Morrison then received a report from Anne -Laurie Autin ("Autin') (a neophyte photographer), who complained that while she was in attendance at a *FotoFest* conference in March 2016 as a photographer, Professor Fogel had served as a portfolio reviewer of her work.

14.     At *FotoFest*, photographers and reviewers typically meet in a large conference room or hotel ballroom and the reviewees meet with a carefully selected pre-set of reviewers who give an informal, ungraded critique of their work. The setting is analogous to a "speed dating" program, with the aim of providing the participants multiple informal twenty-minute critiques of their work from a variety of experts in the field including curators, historians, editors, collectors, gallerists, and publishers from throughout the world, in an informal setting free of formal grading and written review.

15.     According to Autin, Professor Fogel reviewed her photography portfolio without incident and then, as the review session was ending, he offered her materials about the university, and so as not to end on a negative note, a copy of his business card as he stood up to

4

say goodbye. As he was blindly retrieving a business card from his right pocket inside his sport

coat, he inadvertently pulled out his hotel room key card and jokingly said when he realized it

wasn't his business card, "here is my business card – oops - my room key." Notably, the hotel

room key and business card are of very similar size and shape.

16.     Professor Fogel was embarrassed and immediately laughed aloud, and Autin also

joined in laughing at what was obviously an inadvertent and trivial incident. He immediately put

his room key back in his pocket, and reached into his pocket and gave her his business card. She

left, and he then met with the next photographer waiting their turn to be reviewed.

17.     Professor Fogel had no further contact with Autin, until she sent an unsolicited

email to him on March 23, 2016, to thank him for his review of her work in glowing terms.

Professor Fogel, sent a reply e-mail on May 1, 2016, with a form-letter response, thanking her

for her email. He did not initiate any contact with Autin, all contact was initiated by Autin. There

has been no contact since May 1, 2016.

18.     However, on December 11, 2017, some 18 months later, Autin wrote to Morrison

and said that she understood Morrison was investigating a formal sexual harassment complaint

against Professor Fogel and wanted to report the incident to her.

19.     Ms. Autin said in her report that while she initially thought that what Professor

Fogel said may have been a joke, after discussing the incident with numerous other women at the

conference, including Ms. Little, who told Autin that Professor Fogel "forced himself physically

on her," Autin decided to report the incident.

20.     Following her receipt of these reports, Morrison purportedly began an

investigation into what had taken place. On January 23, 2018 she issued a determination that

"Professor Fogel had committed serious violations of the University's Sexual Misconduct,

Sexual Harassment, and Other Forms of Harassment Policy." Thereafter on March 8, 2018,

UArts Dean Mark Campbell upheld Morrison's conclusions and based upon her report and also

purportedly on unrelated issues of performance, terminated Professor Fogel's employment.

Professor Fogel then took an internal appeal of that decision and requested a hearing but that

request was denied, and he was advised on August 1, 2018 that the UArts Board of Trustees had

upheld his termination.

V.  The UARTS Investigation and Adjudication

21.     The U.S. Department of Education has issued guidelines to colleges and

universities regarding the manner in which they should perform their investigations and

adjudication of Title IX complaints.[1] In investigating and adjudicating the sexual

misconduct allegations against Professor Harris Fogel, the burden was on UArts "to gather

sufficient evidence to reach a fair, impartial determination as to whether sexual misconduct

has occurred and, if so, whether a hostile environment has been created that must be

redressed." [2]

22.     The January 23, 2018 determination by Morrison, that Professor Fogel

committed "a sexual assault" of Professor Jennifer Little in March 2016 in the lobby of a

---

[1] On April 24, 2015, the Department Education issued a Dear Colleague letter, which stated in pertinent part:

"Dear Colleague:
"I write to remind you that all school districts, colleges, and universities receiving Federal financial assistance must designate at least one employee to coordinate their efforts to comply with and carry out their responsibilities under Title IX of the Education Amendments of 1972 (Title IX), which prohibits sex discrimination in education programs and activities. These designated employees are generally referred to as Title IX coordinators."

"Your Title IX coordinator plays an essential role in helping you ensure that every person affected by the operations of your educational institution—including students, their parents or guardians, employees, and applicants for admission and employment—is aware of the legal rights Title IX affords and that your institution and its officials comply with their legal obligations under Title IX……"

https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201504-title-ix-coordinators.pdf
[2]  The Department of Education issued revised Guidelines in September 2017 governing a covered institution's investigation and adjudication of sexual discrimination and sexual assault matters that are set forth at ttps://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf

Las Vegas hotel during the Society for Photographic Education (hereafter "SPE") conference was not supported by the evidence.

23.     Professor Little further alleged that she reported the forced non-consensual kiss to Professor David Graham, another faculty member at UArts. Professor Little claims that she told Professor Graham about the forced non-consensual kiss soon after it happened while they were still at the SPE conference. However, Professor Graham told Title IX Coordinator Morrison that he had no recollection of Professor Little telling him such a thing.

24.     Professor Little also claims that she reported the forced non-consensual kiss to a group of women at the *FotoFest* 2016 conference in Houston, Texas, several weeks after the alleged kiss happened. However, one of the women in the group, Jennifer Colten, a professor at Washington University, told Title IX Coordinator Morrison that she did not recall Professor Little saying that Professor Fogel had forcibly kissed her. The witnesses in the report by Morrison were Susan Burnstine, David Johnson, Etha Piazza, Michael Crouser, Jennifer Colten.

25.     The only person to corroborate Professor Little's claim that she reported the alleged forced non-consensual kiss at the *FotoFest* 2016 conference in Houston is the other complainant against Professor Fogel, Anne-Laure Autin. Ms. Autin's corroboration of Professor Little's allegation is suspect, however, because Professor Little and Ms. Autin communicated with each other before filing their complaints and filed their complaints almost contemporaneously (one day apart). Title IX Coordinator Morrison made no attempt, such as obtaining copies of the electronic mail correspondence between the two

complainants, to investigate improper collusion between the two complainants or otherwise or question the nature of the timing of the complaints.

26.     Professor Little waited approximately 21 months to report Professor Fogel's alleged forced non-consensual kiss.  Professor Little's only explanation for this extreme delay in reporting the alleged misconduct is that she "tolerat[ed]" Professor Fogel's kiss in exchange for his support and professional advice."

27.     Morrison's acceptance of this view was not a "reliable decision" supported by available evidence.

28.     Morrison failed to investigate all of the available evidence in order to make a reliable, objective evaluation of Professor Little's credibility *(i.e.,* that it was suspect and compromised), which resulted in a finding that Professor Little's allegation was founded, even though there was insufficient evidence to support it.

29.     UArts also denied Professor Fogel his due process rights because Morrison's investigation did not provide Professor Fogel with adequate notice of the charges against him. *See* 2017 OCR Q&A, Question 6, page 4 (a school must provide the respondent "the date and location of the alleged incident"). In this case, the Title IX Coordinator failed to provide Professor Fogel with the exact date, time, and location that the alleged sexual assault *(i.e.,* the forced non-consensual kiss alleged by Professor Jennifer Little) occurred. The Title IX Coordinator's failure to investigate the date, time, and location of the alleged incident constituted a failure to "analyze and document the available evidence ... both inculpatory and exculpatory." *Id.* (emphasis added).

30.     Morrison's investigation failed to locate and interview all the members of the group of women and men at the 2016 Houston *FotoFest* Conference to whom Professor

Little allegedly reported Professor Fogel's forced non-consensual kiss.  This was another failure to analyze and document potentially exculpatory evidence.

31.     Morrison's investigation denied Professor Fogel due process because, about the allegations of sexual harassment made by Autin, the Title IX Coordinator failed to gather glaringly obvious exculpatory evidence that would have cast doubt on the veracity of Ms. Autin's allegation. Ms. Autin informed the Title IX Coordinator that she had reported the alleged room key incident to Marta Sanchez Philippe, the Meeting Place Coordinator for FotoFest, on the same day that it allegedly happened. However, Ms. Autin admitted to Title IX Coordinator Morrison that she told Ms. Sanchez Philippe, that it was possible that Professor Fogel's remark about the room key was a "joke" and that his intent was not malicious.

32.     *FotoFest* retained a law firm to investigate the incident and that the law firm investigated and concluded that there was insufficient evidence to substantiate Ms. Autin's allegation. Ms. Autin's contemporaneous and very contradictory report of the incident to Ms. Sanchez Philippe (and perhaps the outside investigator employed by FotoFest) certainly casts doubt on the veracity of her allegation. The Title IX Coordinator's failure to obtain this clearly exculpatory evidence denied Professor Fogel the opportunity to defend himself against the allegation.

33.     The Title IX Coordinator's investigation failed to exclude from consideration multiple unproven, prejudicial allegations against Professor Fogel. The Title IX Coordinator's failure to exclude this evidence constituted a failure "to objectively evaluate the credibility of parties and witnesses" with the result that Professor

Fogel was denied the opportunity to defend himself against the unsubstantiated but yet extremely prejudicial allegations.

34.    The unsubstantiated, gender-based prejudicial statements about Professor Fogel made by Professor Little and relied upon by Morrison were as follows:  (1) he has difficulty working with a woman in a position of authority over him; (2) that other unidentified women at the 2016 Houston FotoFest Conference had heard of Professor Fogel; and (3) that Professor Fogel engaged in "typical male verbal flirting behavior. Such comments were inherently vague and suspect and based upon gender stereotyping about male behavior which was applied to brand Professor Fogel as engaged in predatory sexual activity, although there was no evidence that anything he did was overtly sexual or accompanied by a request for sexual favors from Ms. Little. Further, on information and belief, Little's comment that Professor Fogel "had difficulty working with a woman in a position of authority over him" must have emanated from Massoni or someone else at UArts as Little would otherwise have had no way of possessing such a belief.

35.    The unsubstantiated, gender-based prejudicial statements about Professor Fogel made by Anne-Laure Autin and relied upon by Morrison were as follows: (1) most female photographers at the 2016 Houston FotoFest Conference guessed that it was Harris Fogel when Autin recounted her allegation that he offered her his room key; (2) that an unidentified male photographer stated that he saw Professor Fogel acting in a "sleazy" manner with unidentified female photographers at the 2016 Houston FotoFest Conference; (3) that an unidentified female photographer told Autin that Professor Fogel was "very flirtatious" and she thought he gave her a show "because she was young, cute, and bubbly." These comments were inherently vague and suspect and based upon gender

stereotyping about male behavior which was applied to brand Professor Fogel as engaged in predatory sexual activity, although there was no evidence that anything he did was overtly sexual or accompanied by a request for sexual favors from Ms. Autin.

36.   It was never alleged that Fogel said  "I'd like you to have my (room) card", instead he ended a review with a "Thank You" and handed the participant his card, and said "Here is my card, please feel free to stay in touch, and keep me appraised of your work in the future" And then "Thank you, Good Bye". This is similar to the email he responded to Autin with.

37.    Professor Fogel told Title IX Coordinator Morrison of his concerns on a consistent basis during each and every interview and meeting he had with her, about her improper consideration and reliance upon gender-based stereotypical accusations, such the "typical male verbal flirting behavior" comment made by Professor Little in a Skype conference on January 12, 2018, but Morrison did not address Professor Fogel's concerns other than to say that she would consider addressing the concern in a footnote to her investigation report.

38.    The consideration of Professor Little's comment that Professor Fogel had engaged in "typical male verbal flirting behavior" is particularly troublesome since the OCR's guidelines specifically warn schools not to engage in decision-making techniques or approaches that apply sex stereotypes or generalizations..."

39.   Moreover, during the investigation Professor Fogel advised the Title IX coordinator that during the New Orleans SPE Conference in 2015, defendant Massoni had attempted to give Professor Fogel an unwanted hug and a kiss while at a conference and asked how that conduct could be deemed acceptable (when done by a female) but sexual assault when done by a male. The Title IX coordinator never provided a meaningful

response to the question, nor did UArts take any action on the report although the Title IX coordinator was a mandated reporter and Fogel's claims concerning Massoni were at least as consequential as Little's claims against him. UArts and the Title IX coordinator took no action om Fogel's complaint simply because he is a male.

40.     The UArts investigation also denied Professor Fogel due process by refusing to permit him to have a copy of the Title IX Coordinator's 12-page investigation report. Both Professor Fogel and his counsel requested a copy of the report on multiple occasions and were repeatedly told that it was the investigator's practice not to provide respondents with a copy of the investigation report. Counsel for Professor Fogel suggested that UArts provide Professor Fogel with a redacted copy of the report to protect the identity of witnesses, but UArts officials refused to give Professor Fogel even a redacted copy.

41.     The Title IX coordinator evaluated the claims of sexual harassment and assault under a preponderance of the evidence standard rather than a clear and convincing evidence standard, which was the burden of proof then recommended by the Department of Education. *See* 2017 OCR Q&A, Question 8, page 5. The UArts' investigation denied Professor Fogel due process because it applied a lesser standard of proof-preponderance of the evidence - than the one it applies to other allegations of professorial misconduct.

42.     Professor Fogel also was denied due process because he was not provided the opportunity to respond to the investigation report in writing in advance of the decision of responsibility and/or at a live hearing to decide responsibility. *See* 2017 OCR Q&A, Question 8, page 5.

43.     Professor Fogel also was denied due process because he was denied the opportunity to present witnesses who would have given exculpatory evidence to the Title

IX Coordinator. *See* 2017 OCR Q&A, Question 4, page 3. In a meeting with Title IX

Coordinator Morrison on December 15, 2017, Professor Fogel gave her the name of

witnesses and Morrison simply chose not to interview them.

44.    Professor Fogel also was denied Due Process because the ultimate decision-

maker regarding the allegations, Dean Mark Campbell, has a documented history of bias

and hostility against Professor Fogel. Department of Education regulations require that a

university proceeding which arises from an allegation of dating violence, domestic assault,

sexual assault, or stalking must "[i]nclude a prompt, fair, and impartial process from the

initial investigation to the final result." *See* 34 C.F.R. Dean Campbell was not impartial in

the matter.

45.    Dean Campbell's March 8, 2018 letter to Professor Fogel clearly

demonstrates that he used the sexual misconduct allegations made against Professor Fogel

as a pretext for terminating Professor Fogel because Dean Campbell believed that Professor

Fogel was "obstructionist", difficult to supervise, and not sufficiently collegial. Because it

would have been far more difficult -- if not impossible -- to prove his allegation that

Professor Fogel did not adhere to UArts' "basic requirements of collegiality," Dean

Campbell improperly used the sexual misconduct allegations, with their lower standard of

proof, as a pretext to terminate Professor Fogel.

46.    Professor Fogel also was denied due process and an equitable resolution of the

complaints against him because the UArts neither considered nor offered him an informal

resolution of the complaints. *See* 2017 OCR Q&A.

47.    Neither complainant is an employee of UArts and both allegations largely were

based upon speculation on the part of the complainants as to Professor Fogel's motivations

*(i.e.,* whether he intended to seek sexual favors from either complainant), rather than anything he did.  Further, the kissing of a colleague in a social greeting is commonplace behavior among UArts' faculty members and Board members, and staff, as it is in many social settings. Professor Fogel has been kissed by professional colleagues, including his peers at UArts, literally thousands of times. Autin's report regarding the room key incident was not regarded by her as anything other than an awkward joke when it occurred.

48.   Imposing the sanction of termination from Professor Fogel's employment at UArts was not "a proportionate response to the violation." 2017 OCR Q&A, Question 9, page 6. Even if the decision-maker determined that there was sufficient evidence to warrant a finding of responsibility, which there was not, Professor Fogel should have been offered the opportunity to engage in sensitivity training and to correct any behavioral issues affecting his employment.

49.   Professor Fogel is 59 years-old. He has two children in college. He worked at The UArts for twenty-two years. To terminate his employment as a result of two unsubstantiated and very minor allegations of conduct that cannot fairly be claimed to rise to the level of sexual misconduct simply was not proportionate to the alleged violation.

50.   The UArts investigation also denied Professor Fogel due process by employing a Title IX Coordinator who was not properly trained in conducting Title IX investigations. The Title IX Coordinator's lack of proper training was patently obvious from the fact that she relied upon gender-based stereotyping to conclude that an offense had been committed and then systematically failed to hold a hearing, gather exculpatory evidence, objectively evaluate the credibility of witnesses, and synthesize all the available evidence, both inculpatory and exculpatory with the result that Professor Fogel was denied an equitable

resolution of the complaints against him. It is difficult to conceive of how such a process

and result could satisfy even the most basic and elementary notions of due process,

objectivity and fairness in its conclusion and in its sanction.

## VI.   CAUSES OF ACTION

### COUNT I
### Violation of Title IX (Against UArts)

51.   Plaintiff incorporates each of the paragraphs above as if fully set forth herein.

52.   Title IX of the Education Act Amendment of 1972, 20 U.S.C. § 1981, et seq. ("Title

IX"), provides in relevant part that "[n]o person in the United States shall, on the basis of sex, be

excluded from participation in, be denied the benefits of, or be subjected to discrimination under

any education program or activity receiving Federal financial assistance."

53.   UArts receives substantial federal funding.

54.   Title IX is enforceable through an implied private right of action affording an

individual discriminated against due to his gender damages and equitable relief.

55.   Courts recognize violations on reverse Title IX claims under several theories including

erroneous outcome, selective enforcement, arcane assumptions and deliberate indifference.

Plaintiff makes a claim of discrimination under the erroneous outcome theory.

56.   Both the Department of Education and the Department of Justice have promulgated

regulations under Title IX that require a school to "adopt and publish grievance procedures

providing for the prompt and equitable resolution of student...complaints alleging any action

which would be prohibited by" Title IX or its regulations. 34 CFR Sec. 106.8(b) (Dep't of Ed);

28 CFR Sec. 54.135(b) (DOJ). These actions include any form of sexual touching. *See* generally,

U.S. Dep't of Education, Office for Civil Rights, Revised Sexual Harassment Guidance:

Harassment of Students by School Employees, Other Students, or Third Parties--Title IX (2001) at 19-20, 21 & nn. 98-101.  ("Guidance")

57.   The procedures adopted by Title IX covered schools must not only "ensure the Title IX rights of the complainant," but must also "accord[] due process to both parties involved" (Guidance, *id.* at 22).

58.   These procedures that in the view of the Guidance accord due process when well instituted and aptly followed, must include, at a minimum: "Adequate reliable and impartial investigation of complaints, including: the opportunity to present witnesses and other evidence." (Guidance, *id.* at 20).

59.   A school also has a Title XI-mandated obligation to make sure that all persons handling these procedures "have adequate training as to what conduct constitutes sexual harassment, which includes 'alleged sexual assaults.'"  (Guidance, *id.* at 21).

60.   Based on the foregoing averments of fact, defendant UArts has deprived Plaintiff on the basis of his sex of his Title IX rights, of his statutory due process rights, and equal protection through the improper, malicious, sex-based application of its policies for handling sexual assault which led to the erroneous outcome in this matter.

61.   UArts initiated and conducted the investigation and subsequent hearing of Little and Autin's complaints in a manner that was biased against Plaintiff due to his sex. Among other things, Anne Massoni, Fogel's Department head and a person believed to have been instrumental in the UArts' actions against Fogel, repeatedly had demonstrated an anti-male bias toward Fogel and other males. Massoni regularly critiqued male colleagues and students and their work far more harshly than she did females. She publicly criticized female students who wore high heels and dressed in a traditional feminine way. She regularly shared with students and colleagues

personal and inappropriate details of her experience with having an abortion, and her difficulties in dealing with males in personal relationships.

62.  The UArts Title IX Investigator Lexi Morrison was poorly trained and ill -equipped to do her job. Professor Fogel was wrongly found to have committed a serious violation of UArts offense by an uninformed investigator, who relied on a flawed investigative file, and absent any credible evidence of wrongdoing. ignored evidence.

63.  By using a single investigator/adjudicator model that has been widely condemned as being untrustworthy and unfair, UArts allowed Morrison to perform a flawed investigation and then rely upon the flawed investigation to come to an erroneous and biased conclusion. None of the activity allegedly engaged in by Professor Fogel constituted a violation of UArts' policies on sexual misconduct or sexual harassment as there was no allegation that it was overtly sexual in nature or accompanied by a request for sexual favors or sexual activity, nor was it severe or pervasive, nor was it a violation of the Pennsylvania criminal code prohibiting sexual assault or indecent assault.

64.   Due to Plaintiff's gender, UArts imposed sanctions on Plaintiff that were excessively severe because of his sex in violation of Title IX.

65.   UArts improperly and illegally based its investigation and conclusions upon gender stereotypes that Professor Fogel's naturally outgoing and joking manner were predatory and seductive behavior even though nothing contained in UArts' investigation and conclusions contain a shred of overtly sexual conduct on the part of Professor Fogel.

66.   As a direct and proximate consequence of UArts' Title IX violations, Plaintiff has sustained significant damages including termination of his employment as a tenured professor.

67.   Plaintiff has also suffered significant monetary damages, profound emotional distress, loss of educational opportunities, and other direct and consequential damages. Fogel's physical health suffered and his professional opportunities such as exhibitions, teaching, lecturing, and grants largely disappeared because of defendants' actions.

## COUNT II
## Breach of Contract (Against UArts)

68.   Plaintiff incorporates each of the paragraphs above as if fully set forth herein.

69.   At all times relevant hereto, a contractual relationship existed between UArts and Plaintiff through, inter alia, UArts written policies and handbooks regarding discipline of tenured faculty members and handling of sexual harassment complaints.

70.   In those written policies and handbooks, UArts makes repeated explicit references to the provisions of Title IX and the work of the Title IX coordinators deputy Title IX coordinators.

71.   Upon information and belief, UArts employs a Title IX coordinator because it believes that it is mandated to do so by various provisions of Title IX and because it believes that its handling of gender-based complaints is subject to oversight by U.S. Department of Education.

72.   Further, the prominent and repeated references to Title IX in the language of the UArts' written policies and handbook constitute an agreement among the parties that Title IX investigations and adjudications would proceed in accordance with Title IX's governing standards for such matters. By way of further allegation, UArts by identifying a "Title IX coordinator" in its written policies and handbook and giving such person the apparent authority to conduct a Title IX investigation, led Professor Fogel reasonably to believe that the Title IX coordinator was trained and knowledgeable about matters related to Title IX and would conduct an investigation and adjudication in accordance with guidance issued by the U.S. Department of

Education regarding the manner in which such things were to be conducted and constituted a binding agreement among the parties as that issue.

73.     UArts breached that agreement by failing to follow virtually any of the guidance issued by the U. S. Department of Education in terms of the procedures to be followed, the evidence relied upon, the rights of the respondent to review reports and evidence, the right to present evidence at a hearing or otherwise and respondent's right to an investigation untarnished by bias and self-interest.

74.     The UArts Faculty Handbook provides at page 34 that "Reports of sexual harassment sexual misconduct or other forms of harassment will be kept as confidential as possible. Information about complaints and investigations will be shared only on a need-to-know basis."  Similar language prohibiting disclosure of facts relating to sexual harassment claims and investigations appear in multiple other provisions of UArts' handbooks.

75.     UArts breached this agreement when it publicly disseminated facts relating to the investigation of Professor Fogel to employees and third parties who had no need to know this information.

76.     As a direct, proximate and foreseeable consequence of UArts numerous material breaches, Plaintiff has sustained significant damages including, but not limited to loss of his tenured professorship, and as a consequence of these breaches with a resulting loss of lifetime earnings, loss of education opportunities, pain and suffering, and other direct and consequential damages.

77.     Plaintiff is entitled to recover damages for UArts' breach of its contractual obligations and duties including specific performance of the contract.

COUNT III
Negligence (Against UArts)

78.    Plaintiff incorporates each of the above paragraphs as if fully set forth herein.

79.    In the event the Court were to find that no contracts exist between Plaintiff and

Defendant, UArts owed duties of care to Plaintiff independent of any contractual duties

including, but not limited to an academic environment free of sexual hostility where sexual

misconduct policies and procedures were fair and reasonable; including providing him with

support through trained and non-biased administrators.

80.    Based on the aforementioned facts and circumstances, UArts has breached its duties of

care owed to Plaintiff.

81.    As a direct, proximate and readily foreseeable consequence of UArts' aforementioned

conduct, Plaintiff has sustained significant damages including, but not limited to, monetary

damages, emotional distress, loss of education opportunities, and other direct and

COUNT IV
Defamation and Invasion of Privacy (Against All Defendants)

82.   Plaintiff incorporates by reference each of the above paragraphs as if fully set forth

herein.

83.   Defendant UArts, acting through its managers, Mark Campbell and Anne Massoni,

repeated to other UArts' employees that Plaintiff had been fired for sexual harassment and such

statements were made prior to Plaintiff receiving official notice of his termination.

84.   For example, while Professor Fogel was on a suspended status during the investigative

proceedings, a former student trying to locate him (James Singewald) was told on January 13,

2018 by a security guard that Professor Fogel "had been fired." On information and belief,

plaintiff avers that the same or similar statements were made by UArts, Massoni and other employees prior to and after the termination of Professor Fogel's employment.

85.   There was no legitimate need for UArts and Massoni to have made such comments to UArts' faculty and other employees, and it was done maliciously and without privilege in a further effort by them, acting within the scope of their authority at UArts, to further damage the reputation of plaintiff, which it did.

86.   Defendant Little falsely and maliciously stated to UArts' employees and other third parties that she had been sexually assaulted and harassed by Plaintiff, when, in fact, she had not.

87.   Defendant Little knew or should have known when she made these false and defamatory statements that their impact would damage and injure Professor Fogel in his professional position at UArts in Philadelphia, Pennsylvania and thus her tortious conduct was directed at this forum.

88.   On February 22, 2018, during a photography faculty meeting prior to the SPE National Conference to be held in Philadelphia to discuss the conference, defendant Massoni told the group, in response to a question from a faculty member about Professor Fogel's status, "If people ask you about Harris at the SPE Conference, there is nothing for you say, because you don't know anything, so change the subject." Massoni added that "if someone wants more information you can also refer them to the school's Title IX office" knowing that a listener would necessarily draw the inference that Professor Fogel no longer at the school as a result of a Title IX issue.

89.   There was no legitimate need for Massoni to have made such comments to UArts' faculty and other employees, and it was done maliciously and without privilege in a further effort by Massoni, acting within the scope of her authority at UArts, to further damage the reputation of plaintiff, which it did.

90.   On information and belief, UArts' employees, including Massoni and Christine Schaeffer, Associate Vice President for Human Resources for UArts, and Little published and thereafter repeated their false and defamatory accusations about Plaintiff to third parties, such as the Society for Photographic Education ("SPE") and other professional organizations.

91.   Upon Professor Fogel's attempt to renew his SPE membership in October 2018, SPE immediately advised him that he "was not welcome at any of its professional events," even though he had participated in SPE events for over thirty years in a professional capacity and was publicly recognized on numerous occasions for his volunteer service to the organization.

92.   On February 14, 2018, SPE's president wrote to Professor Fogel that "Based on recent disciplinary actions and at the direction of The University of the Arts, I am writing to advise you that your membership in SPE and your registration at the SPE 55[th]Annual Conference in Philadelphia, Pennsylvania, have been cancelled…." Upon information and belief these statements came from one or more employees of UArts or Little as Professor Fogel never had advised SPE of "recent disciplinary action."

93.   These statements by UArts, Massoni and Little were made with knowledge of their falsity or reckless disregard for their truth or falsity and with malicious intent and without any qualified privilege. In addition, Morrison also disseminated information about the accusations to third-parties without any legitimate purpose in doing so, and thereby exceeded the scope of any conditional privilege that otherwise may have existed.

94.   These statements are defamatory because they arise out of the defamatory character of the communications about Professor Fogel; their publication by the defendants; their application to the plaintiff; understanding by the recipients of their defamatory meaning; understanding by

the recipients of them as intended to be applied to Professor Fogel special harm to the plaintiff; and abuse of conditionally privileged occasion.

95. These statements also constitute the tort of invasion of privacy because they arise out of publication of statements that were not true, were highly offensive to a reasonable person as they portray Professor Fogel as a sexual predator or harasser, and were publicized with knowledge or in reckless disregard of its falsity.

96. The actions of defendants have damaged significant and long-lasting damage to the professional reputation to the reputation of plaintiff and virtually eliminated the possibility that he will ever again find an equivalent position in higher education in his chose field.

97. Defendants' actions have further damaged plaintiff such that he is no longer welcome in professional organizations in which he participated and played a leadership rules and exhibited his work, thus causing him permanent and long lasting economic and non-economic injury and damaging his personal and professional standing within the community. This constitutes defamation and invasion of privacy as they refer to matters that were supposed to have been undertaken in private by UArts and those acting in concert with it.

WHEREFORE, plaintiff requests that he be awarded damages in an amount to be determined at trial, including, but not limited to economic damages, damages to physical well-being, emotional damages, damages to reputation, loss of career prospects as well as prejudgment interest, punitive damages, attorneys' fees, expenses, and costs, and any other relief

that the Court deems just and proper.

Respectfully submitted,

ZARWIN, BAUM, DeVITO, KAPLAN,
SCHAER & TODDY, P.C.

_____/s/_____
DAVID F. MCCOMB
ZACHARY A. SILVERSTEIN
1818 Market Street, 13th Floor
Philadelphia, PA  19103
215.569.2800; Fax  215.569.1606
Attorneys for Plaintiff
dfmccomb@zarwin.com
zsilverstein@zarwin.com

Dated:  February 18, 2019

<u>CERTIFICATE OF SERVICE</u>

I, David F. McComb hereby certify that I served the foregoing Amended Complaint by

making it available to all registered users of the Court's ECF system, including the following:

> Joseph Centano, Esq.
> 50 S. 16th Street, Suite 3200
> Philadelphia, PA 19102-2555
>
> and
>
> Francine F. Greisling, Esq.
> 1880 JFK Boulevard, Suite 1800
> Philadelphia, Pennsylvania 19103

> _____/s/_____
> DAVID F. McCOMB

DATED:  February 18, 2019